**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE (ABINGDON) DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **CHAPTER 12** |
| **TERRY PROPERTIES, LLC,** | ) | |
| | ) | **CASE NO. 16-71449** |
| Debtor. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the Amended Chapter 12 Plan of Reorganization

("Amended Plan") of the Debtor, Terry Properties, LLC (the "Debtor"), and the objections

thereto filed by Farm Credit of the Virginias, ACA ("Farm Credit"), Southern States Marion

Cooperative, Inc. ("Southern States"), and the Chapter 12 Trustee (the "Trustee").  A trial was

conducted on these matters on June 15–16, 2017.

## FACTUAL BACKGROUND

At issue in this case is a roughly 677-acre farming operation in Rural Retreat, Virginia,

with portions of the farm in Smyth and Wythe counties.[1]  Ernest Epperson Terry ("E.E. Terry")

acquired the farm in the Fall of 1969.  E.E. Terry and his family operated the Cedar Springs

Dairy on the farm up until his death in 2007.  Following E.E. Terry's death, the farm was

conveyed to a testamentary trust (the "Trust").  E.E. Terry's son David Terry, daughter Linda

Terry Ruble, and grandson Jacob Terry[2] served as trustees of the Trust.  The Terry family

continued to operate the dairy farm through the Trust from the time of E.E. Terry's death until

2015.  According to the testimony of David Terry, the duration of the Trust was limited to ten

---

[1] Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.  *See* Fed. R. Bankr. P. 7052; 9014(c).

[2] E.E. Terry's son Tim Terry predeceased him in 2005.  Jacob Terry was Tim Terry's only child.

(10) years.  In the Fall of 2015, the trustees decided to disburse the assets of the Trust into two

newly-formed limited liability companies:  Terry Dairy LLC ("Terry Dairy") and the Debtor.

Terry Dairy took title to all of the personal property held by the Trust and the Debtor took title to

all of the real property.  At some point in time, David Terry conveyed an interest he had in real

estate adjoining the farm to Linda Terry Ruble in exchange for her 1/3 interest in the dairy.  As

of today, the members of Terry Dairy and the Debtor are David Terry, who holds a 2/3 interest,

and Jacob Terry, who holds a 1/3 interest.

 David Terry testified that Farm Credit's involvement with the Terry family dates back 47

years.  In October of 2015, Farm Credit entered into a Loan Restructure Agreement

("Restructure Agreement") with David and Jacob Terry, as trustees of the Trust; David Terry,

Jason Terry, Jacob Terry, and Levi Terry, each individually; Terry Dairy; and the Debtor, all as

co-borrowers.  Under the terms of this Restructure Agreement and a corresponding Deed of

Assumption, the Debtor took title to the Trust real estate and assumed liability for five Notes

held by Farm Credit jointly and severally with the other borrowers.  Three of these Notes were

secured by Credit Line Deeds of Trust ("CLDOTs") against the Debtor's real estate.  By the

terms of the Restructure Agreement, the total balance due on all loans matured on August 1,

2016.  The total balance due to Farm Credit under the Notes is $2,663,729.73, including

principal, interest, legal fees, and other charges.  Of that debt, $2,100,437.27 is secured by the

three CLDOTs.[3] *See* Farm Credit Ex. 8.

 At the time the parties entered into the Restructure Agreement, the Terry family

contemplated remaining in the dairy business.  Newly-formed Terry Dairy sought assistance

---

[3] Under the terms of the CLDOTs, each CLDOT secured any and all indebtedness of the Borrower to Farm Credit,
up to the maximum principal amount of the CLDOT.   The amount of $2,100,437.27 is the maximum amount of the
principal secured, plus interest and other fees and charges pursuant to the terms of the documents.

from the Farm Service Agency to expand its herd of dairy cows from roughly 250 to 500 head.

In addition, Terry Dairy constructed two new barns and a new commodity shed.  By the Spring

of 2016, however, dairy prices dropped drastically.  According to the testimony of David Terry,

the dairy business was losing $30,000.00 per month at that time.  The Terry family made the

decision in March of 2016 that if dairy prices remained low, they would have to get out of the

dairy business altogether.

It was around this time that the Terry family was approached by Branch Botanicals, Inc.

("Branch Botanicals").[4]  Branch Botanicals is a start-up company that is seeking to develop a

market for products such as flavorings, preservatives, anti-microbials, fungicides, and pesticides

created from oils derived from a specific species of cherry plant.  Through discussions with the

Virginia Department of Agriculture and the Virginia Tech Extension Service, Branch Botanicals

made the decision to locate a processing facility for the cherry plants in Wythe County.  These

particular cherry plants are not harvested for their fruit.  Rather, the plants are grown as a row

crop, planted with a tobacco planter.  The plants are harvested close to the ground annually,

which ensures that the plants more resemble bushes than trees.  When the entire plant is

harvested each year, the number of shoots stemming from each root ball increases.  Branch

Botanicals estimates that growing the plants in this manner will yield about 10–12 tons of

biomass per acre.[5]  This process has been tested at farms in Oregon, but the operation in Wythe

---

[4] Branch Botanicals has sought to protect its trade secrets and confidential business information relating to the Terry farm.  Accordingly, many of the facts recited in this Opinion about Branch Botanicals, while taken from the record, are also contained in public statements of or articles about Branch Botanicals that were furnished during the case. *See* Farm Credit Exs. 25–27.

[5] Farm Credit has characterized the cherry plants as "sour" cherry trees and as an invasive species difficult for farmers to eradicate, on occasion comparing the plants to kudzu.  This allegation was not supported by any expert testimony from a forester or agronomist. The Terrys, who are long-time farmers with experience dealing with native wild cherry trees, testified that eradication is not of concern, and these plants could be plowed to the edge of a field if needed.  The Court finds their testimony credible and the concerns over eradication to be more hyperbole than fact.

County is Branch Botanicals's first endeavor to grow and process these plants at a commercial scale.

Branch Botanicals approached the Terry family in the Spring of 2016 about the possibility of entering into an agreement to grow these cherry plants. After a few months of negotiations, the Debtor and Branch Botanicals entered into a contract on June 29, 2016 by which Branch Botanicals agreed to finance a large portion of the start-up costs to convert the Terry farm from a dairy into a cherry plant farm through guaranteed payments for the first three years of growing. After the initial start-up period, the Debtor will be paid per pound of biomass produced. David and Levi Terry testified that they entered into this agreement because the guaranteed nature of the payments from Branch Botanicals for the first three years reduced the market risk facing them in the dairy business. In addition, they testified that the money they receive each month from Branch Botanicals exceeds what they could make if they were to remain a dairy.

After entering into the contract with Branch Botanicals, the Terrys approached Farm Credit to seek an agreement whereby the existing loans would be re-amortized over a period of 20 years as each of the five outstanding Farm Credit loans matured on August 1, 2016. Representatives of Farm Credit, Branch Botanicals, and the Terrys met in September of 2016 on the Terry farm to allow Farm Credit to hear Branch Botanicals's pitch and take notice of the steps already taken to implement the cherry growing contract. While the parties engaged in negotiations of a possible second loan restructure, ultimately no agreement was reached to re-amortize the debt. This prompted the Debtor to file its petition under Chapter 12 of the Bankruptcy Code on November 2, 2016.

The Debtor and several members of the Terry family were also involved in two state court lawsuits at that time. The first, according to Southern States,[6] is a lawsuit filed by Southern States pending before the Circuit Court of Wythe County, Virginia originally against the Debtor, Levi Terry, Jason Terry, and Terry Dairy. Counsel for Southern States has represented to the Court that this is an action to recover upon a claim for $103,321.55 of unsecured debt arising from the purchase of goods and services on an account previously held by the Trust. An Order nonsuiting the Debtor from this action was entered in March of 2017. The second state court lawsuit is an action filed by Farm Credit against Terry Dairy, David Wilmer Terry, Jacob Jerome Terry, Jason B. Terry, and Levi Ernest Terry in the Circuit Court of Smyth County, Virginia seeking a Judgment in Detinue so that it can repossess and sell certain personal property collateral. The Debtor was not named as a defendant in this action, although it is a co-borrower on the Notes. This matter is set for trial on July 25, 2017. *See* Farm Credit Exs. 50–53.

The Debtor filed its Chapter 12 Plan of Reorganization on January 18, 2017. Farm Credit, Southern States, and the Chapter 12 Trustee filed objections to that plan. The Court scheduled the matter for a contested confirmation hearing on June 15–16, 2017 in Roanoke, Virginia for the convenience of the parties and attorneys. The Debtor filed the Amended Plan on June 1, 2017.[7]

The Amended Plan proposes to devote all of the Debtor's disposable income to the plan for a period of sixty (60) months to begin in July 2017, with administrative and priority claims to be paid in full. The Amended Plan proposes two alternative plans for the treatment of Farm

---

[6] No copy of the Complaint in this lawsuit has been furnished to the Court. Southern States's Proof of Claim includes numerous invoices and a statement of the nature of the claim, although it contains no mention of a pending lawsuit. The only document pertaining to this lawsuit the Court has seen is Southern States's Exhibit G, a copy of the Order nonsuiting the Debtor from that action.

[7] The Court addressed the issue of compliance with the noticing requirements of Federal Rule of Bankruptcy Procedure 2002(a)(8) in a separate Order. *See* Docket No. 211.

Credit, depending upon the outcome of the appeal of an adversary complaint challenging the modified CLDOTs. Under "Plan A," the Debtor proposes to pay Farm Credit the value of its secured claim, $2,100,437.27, less the adequate protection payments made prior to confirmation of $105,160.00, in 180 monthly payments of $16,039.59. This is based upon a 180-month amortization with interest at 5.75%.[8] In addition, the balance of the secured portion of Farm Credit's debt shall be due in full ten (10) years after entry of the final order of confirmation.[9] Under "Plan B," the balance remaining of Farm Credit's secured debt, which will be determined by the Court, will be repaid over a term of 180 months with interest at 5.75%. The Debtor estimates the payment under "Plan B" would be $14,442.22. The same balloon feature is also incorporated into "Plan B." While the Amended Plan does not directly address Southern States's claim, unsecured creditors will receive their pro rata share paid by the Trustee over a term of sixty (60) months. The Debtor's means of implementation are to commence making payments directly to Farm Credit on its secured debt, and to commence making monthly payments to the Trustee in the amount of $3,000.00 beginning within thirty (30) days following confirmation. The plan provides that within ninety (90) days of the end of each calendar year, the Debtor will provide the Trustee with a financial statement that shows the net income of the Debtor after taxes and, if necessary, within thirty (30) days of that information being furnished to the Trustee, the Debtor will issue an additional check to the Trustee in an amount equal to any additional disposable income that had not been paid during the previous twelve (12) month period. The

---

[8] Since the filing of the Amended Plan, the prime rate has been adjusted upward from 4.00% to 4.25%. Accordingly, the Debtor now proposes to pay 6% interest on Farm Credit's claim.

[9] The Debtor stated at the hearing that it now proposes to provide for the balloon payment to coincide with the termination of the Branch Botanicals contract, which will be roughly nine (9) years from the date of entry of the final order of confirmation.

plan also provides to assume the farm lease contract with Branch Botanicals.[10]  Finally, the plan

seeks to impose a third-party injunction to prevent the two state court lawsuits against the co-

borrowers from going forward.

Farm Credit, Southern States, and the Trustee filed Objections to Confirmation.  Farm

Credit asserts that the plan fails to meet the hypothetical Chapter 7 liquidation test contained in

11 U.S.C. § 1225(a)(4) because the plan understates the value of the Debtor's assets and the

amount of unsecured claims against the estate.  In addition, Farm Credit asserts that the amount

to be distributed to its allowed secured claim is less than the allowed amount of the claim in

contravention of 11 U.S.C. § 1225(a)(5) because the interest rate proposed falls below the

requirements of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), and the term of repayment is not

reasonable.  Farm Credit also asserts that the plan is not feasible as required by 11 U.S.C.

§ 1225(a)(6).  Finally, Farm Credit asserts that this case does not present the extraordinary

circumstances necessary to impose a third-party injunction staying the lawsuits pending against

the co-borrowers.

Southern States raises the same objections as Farm Credit as to valuation of the Debtor's

assets, the improperly low interest rate to creditors, and the impropriety of a third-party

injunction.  In addition, Southern States has objected on the grounds that the plan has not been

filed in good faith as required by 11 U.S.C. § 1225(a)(3) because the plan seeks to enjoin the

Southern States state court lawsuit without providing for full payment of its claim.  Finally,

---

[10] The plan does not provide for the Debtor to assume farm leases it apparently holds on lands adjacent to and
nearby the Terry farm.  According to testimony from members of the Terry family, the Debtor leases 125 acres of
farm land from David Terry's sister, Linda Terry Ruble, and sister-in-law, Eva Terry, upon which it intends to plant
cherry plants under the Branch Botanicals contract.  Apparently in exchange for allowing the Debtor to use this land,
the Debtor pays Ms. Ruble's property taxes and utility bills, and the Debtor pays Ms. Terry's health insurance
premium.  In addition, the Debtor leases certain smaller parcels from neighboring farms amounting to about 70 acres
upon which it grows corn.  According to the testimony at the hearing, the Debtor intends to assume these leases as
well.

Southern States also asserts that the plan fails to provide for the submission of all or a sufficient portion of the Debtor's future income to the supervision and control of the Trustee in violation of 11 U.S.C. § 1222(a)(1).

The Trustee asserts objections that the plan does not comply with all provisions of the Bankruptcy Code in contravention of 11 U.S.C. § 1225(a)(1) and that the Debtor is not able to make all payments under the plan in contravention of 11 U.S.C. § 1225(a)(6).  While the Trustee did not object on 11 U.S.C. § 1225(a)(4) grounds, he indicated that he may have concerns about the liquidation test depending upon the ultimate valuation of the Debtor's assets arrived upon by the Court.

Prior to the confirmation hearing, on April 19, 2017, the Court conducted a view of the Terry farm.  The Terrys, Counsel for the Debtor, Counsel for Farm Credit, and the Trustee accompanied the Court on a tour of the cherry tree growing operation, the improvements to the irrigation system that Branch Botanicals has funded over recent months, and the Terry family's houses.

The Court conducted a two-day trial on these matters on June 15–16, 2017.  At trial, the Court heard testimony from four members of the Terry family:  David Terry, Levi Terry, Jason Terry, and Jacob Terry.  Each of the Terrys live in houses on out-parcels surrounded by the farm. It is apparent to the Court that the Terry family is exceptionally hard working and dedicated to their farm.  It is also clear that the farm means a great deal to this family, and that they are willing to go to great lengths in terms of time and effort to save it for their family.

David Terry testified as to the current progress under the Branch Botanicals farm lease. By the terms of the contract, the Terrys are to have planted 425 acres this year.  At the moment, the Debtors have planted 300 acres on the Terry farm and intend to plant the additional 125 acres

8

on the adjoining land owned by Linda Terry Ruble, David's sister.  *See* n.9, *supra*.  During

David Terry's testimony, it was proposed that Terry Dairy could surrender equipment valued at

approximately $300,000.00 that currently serves as collateral for Farm Credit's Notes.  The

Debtor currently pays Terry Dairy $10,471.00 per month for the rental of this equipment, and

certain pieces would not have to be replaced for the Debtor to continue operations.  David Terry

also testified as to his belief as to the valuation of the Terry farm.  He believes, based upon years

of watching neighboring farms in the area be bought, sold, and auctioned, that the farm is worth

$3,500.00 per acre.  While at times during his testimony David Terry suggested that this

valuation did not include any improvements upon the land, the Court finds from the totality of

his testimony that his belief is that the total value of the farm, including improvements, is

$2,362,500.00.[11]

      Levi Terry keeps the books and records of the Debtor.  He takes care of paying routine

bills and ensures that records are sent to the bookkeeper for payroll processing.  He prepared the

Debtor's cash flow projections, which are attached to the Amended Plan as Exhibit B.  Levi

Terry testified in detail as to how he arrived at his projections, which include a plan to purchase

or refinance the Terry Dairy equipment that currently serves as additional collateral for Farm

Credit's Notes.  Under this proposal, the Debtor will seek a $300,000.00 loan from Linda Terry

Ruble to purchase the equipment from Farm Credit, then the Debtor will sell off pieces of

equipment it does not need by private sale.[12]  The $300,000.00 loan would be amortized over a

---

[11] This figure was determined by multiplying price per acre by 675 acres.  The Waddle appraisal, discussed in more detail later in this Opinion, reflects the total acreage to be 677.22 acres "+/-".

[12] Levi Terry testified that of the $300,000.00 worth of equipment proposed to be bought or refinanced, the pieces the Debtor requires to maintain its current operations are worth roughly $175,000.00.

period of seven (7) years at 7% interest, which results in an approximate $4,500.00 monthly payment.

Levi Terry, Jason Terry, and Jacob Terry[13] each testified as to the harm that would befall the Debtor absent the injunction staying the co-borrower state court litigation.  Each testified that if they were to lose their houses or vehicles, they would be unable to work for the Debtor.  They testified that this would result in harm to the Debtor because they know the equipment, they know the planting history, and they know the finances of the Debtor.  Levi Terry testified that bringing in new workers and developing the same level of familiarity with the operations of the Debtor would be difficult and costly. The inference from the testimony is that if the creditors cannot be kept at bay against the Terrys individually, they would have little incentive to keep the farm operation running—which is the primary source of repayment to pay back the very same creditors.[14]

Dr. Dan Tolley, the president of Branch Botanicals, offered testimony about the background of the company.  Dr. Tolley testified about the decision-making process that led Branch Botanicals to decide to locate its processing facility in Wythe County, and the decision to partner with the Debtor.  Dr. Tolley also testified about the financial condition of Branch Botanicals.  The Court is cognizant that much of this information is commercially sensitive, and as such the Court will not recite Dr. Tolley's testimony in great detail.  However, it is clear that Branch Botanicals is a start-up company that faces challenges that many start-ups face.  While the company has successfully raised some capital, it is still actively seeking new investors to realize the full potential of the company.  Branch Botanicals expects to bring its products to

---

[13] Jacob Terry is not a defendant in the Southern States co-borrower action, but he is a defendant in the Farm Credit co-borrower action.

[14] With the exception of Jacob Terry, none of the Terrys appear to have any significant unencumbered assets available to creditors.  Jacob Terry owns an LLC, which has his unencumbered house as its primary asset.

market in 2018.   As of the trial date, the evidence reflected that Branch Botanicals has no

binding contracts for any of the product to be produced from the Terry farm cherry plant harvest,

nor does it currently have a processing facility capable of processing the harvest.  It has,

however, made approximately $500,000.00 in improvements on the farm, in addition to funding

over $600,000.00 in interim payments to the Debtor to keep the farm operating.  It has acquired

land in Wythe County for the construction of its processing facility, which to date is delayed in

part due to insufficient funding and the lack of a needed permit from the Virginia Department of

Environmental Quality ("DEQ").[15]

Farm Credit presented evidence of the valuation of the Debtor's farm through an

appraisal prepared by Robert Waddle on January 28, 2015 and an update to the appraisal he

prepared on March 17, 2016.  Each of these appraisals value the Terry farm at $2,775,000.00.  In

preparing the initial appraisal, Mr. Waddle took three approaches to value the property: the cost

approach, the sales approach, and the income approach.  The cost approach takes into

consideration the value of the unimproved land and adds the value of the improvements.  The

sales approach is a comparison based upon sales of comparable properties in the area within a

recent period.  The income approach is based upon the income producing potential of the

property derived from client information and market information.  Both the initial appraisal and

the update were requested by Farm Credit for financing purposes.  At the time of both the initial

appraisal and the update, the Terry farm was an operating dairy.  Mr. Waddle testified that since

the time of his appraisal and subsequent update, the market for agricultural land in Smyth County

has generally declined, and that functional obsolescence of the dairy equipment and fixtures not

currently in use would also negatively affect the value.

---

[15] The testimony from the trial indicated that Branch Botanicals will need additional capital to complete its transition
to market, which it hopes to obtain but which it does not yet have in hand or definitively committed.

During the testimony of Manuela Schabel, a Loan Workout Officer for Farm Credit who offered evidence of the current balances due on the Notes, it came to light that Farm Credit had requested and received a more recent appraisal than Mr. Waddle's March 2016 update.  This appraisal was prepared February 1, 2017, and arrived at a valuation of $2,200,000.00, substantially lower than Mr. Waddle's March 2016 Update.  Farm Credit discussed the methodology with the second appraiser, and contends that it ultimately determined that the report was of questionable value because of perceived flaws in the methodology used.  Accordingly, Farm Credit decided not to present the Court with value contained in the most recent appraisal found in its file.[16]

Finally, the Debtor and Farm Credit each called an expert witness to testify as to the appropriate interest rate to be paid on Farm Credit's secured claim under the principles enumerated by the Supreme Court in *Till*.  The Debtor presented the opinion of Jay Kilkenny, the Managing Director of Kinsale Advisors in Charlotte, North Carolina.  Mr. Kilkenny has substantial experience in turnaround management and in providing financial advice to both debtors and creditors in bankruptcies.  In addition, he has worked as a principal manager and investor in two early stage companies.  Mr. Kilkenny first analyzed whether there would be an efficient market for this loan, and determined based upon his research that there would not be. From there, Mr. Kilkenny turned to the prime plus formula approach enumerated in *Till*.  In arriving at his proposed risk adjustment, Mr. Kilkenny visited the Terry farm, had discussions with Branch Botanicals, and examined the extensive financial documentation produced during discovery in this case from both the Debtor and Farm Credit.  Mr. Kilkenny ultimately made

---

[16] Over Farm Credit's objection, counsel for the Debtor was permitted to probe Farm Credit's witnesses as to whether any decisions, internal or otherwise, were made on the basis of the $2,200,000.00 appraisal, including why Farm Credit discounted its value for use at trial.

three risk adjustments.  The first was an adjustment of 25 basis points due to the high loan-to-value ratio present in this case.  The second was a 125 basis point adjustment to compensate for the risk associated by being completely dependent on Branch Botanicals for viability.  The third was a 25 basis point adjustment based upon the Debtor's past credit history.  Ultimately Mr. Kilkenny opined that an appropriate *Till* interest rate in this case would be 175 basis points, or 1.75%, above the prime rate.  At a base prime rate of 4.25%, under Mr. Kilkenny's opinion, the interest rate should be 6%.

Farm Credit's interest rate expert was Al P. Saufley, II.  Mr. Saufley is the Chief Lending Officer for Farm Credit.  He oversees Farm Credit's $1.9 billion loan portfolio.  Mr. Saufley has over 30 years of experience in the agricultural lending sector.  While he does not generally make decisions about interest rates in individual cases, he sets lending policies in conjunction with the committee designed to protect Farm Credit's safety and soundness.  Mr. Saufley has never testified as an expert witness before.  He has not authored any papers or presentations on interest rates.  He does not have any background in investment banking.  He read the *Till* case in conjunction with the preparation of his report.  He has not personally visited the Terry farm.

Mr. Saufley testified extensively about Farm Credit's internal loan risk rating system.  From his testimony, it is clear that Farm Credit would not make the loan at issue in this case under the present business model.  On the internal scale of 1 to 14, with 1 being the least amount of risk and 14 being the most, Mr. Saufley testified that this loan would be rated at a 12.  Mr. Saufley concluded at the hearing that there would not be an efficient market for this loan based upon his industry experience and knowledge of the market.  As to the risk adjustment using the *Till* prime plus formula, Mr. Saufley concluded that the appropriate interest rate would be 16% above prime.  This includes the risk inherent to Branch Botanicals as a start-up company.  In Mr.

Saufley's opinion, the risks to Branch Botanicals and to the Debtor are inseparable, and only

venture capital would provide funding for such a risky operation.  Mr. Saufley could not break

out which portions of his 16% risk adjustment were particular to any individual aspect of the risk

associated with start-up companies.  Counsel for Farm Credit did not move for admission of Mr.

Saufley's report, and accordingly it is not part of the record.

Southern States and the Trustee did not call any witnesses or present any evidence

beyond the exhibits admitted to the record.  The Court heard oral argument, then took the matter

under advisement following the two-day trial.


## CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§

1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on

December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the

Western District of Virginia.  This Court further concludes that this matter is a "core" bankruptcy

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (L), and (O).

### I.    Burden of Proof and Plan Confirmation Requirements

A Chapter 12 debtor bears the burden of proof by a preponderance of the evidence to

show that a proposed plan should be confirmed.  *In re Pressley*, 502 B.R. 196, 202 (Bankr.

D.S.C. 2013).  Similarly, if a creditor challenges any element required for Chapter 12 plan

confirmation, the debtor maintains the burden of proving its compliance therewith.  *Keith's Tree*

*Farms v. Grayson Nat. Bank*, 535 B.R. 647, 652 (W.D. Va. 2015) (citing *In re Brown*, 244 B.R.

603, 607 (Bankr. W.D. Va. 2000)).

Section 1225(a) sets forth the requirements for a Chapter 12 plan to be confirmed. *See* 11 U.S.C. § 1225(a). Section 1225(a)(6) of the Code requires a Chapter 12 debtor to "be able to make all payments under the plan and to comply with the plan," i.e., the plan must be feasible. 11 U.S.C. § 1225(a)(6); *see also In re Keith's Tree Farms*, 519 B.R. 628, 637 (Bankr. W.D. Va. 2014). Courts within the Fourth Circuit consider "the debtor's historical performance and current condition of the debtor's business" when evaluating feasibility. *Keith's Tree Farms*, 519 B.R. at 637 (citing *Farmers Home Admin. v. Rape (In re Rape)*, 104 B.R. 741, 748–49 (W.D. N.C. 1989)). Moreover, "[s]incerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Id.* (quoting *Rape*, 104 B.R. at 749). A determination of feasibility is "never certain, particularly in farm situations," but "[n]evertheless, the ultimate burden of establishing feasibility, as with all elements of confirmation, rests on the debtor." *Id.* (citations omitted). Accordingly, a Chapter 12 debtor "must persuade the court that 'it is probable, not merely possible or hopeful, that the Debtors can actually pay the restructured debt and perform all obligations of the plan.'" *Id.* (quoting *Rape*, 104 B.R. at 749). When "considering the evidence, 'the court should give the Chapter 12 debtor the benefit of the doubt regarding the issue of feasibility when the debtor's plan projections use reasonable data in light of the current economic climate.'" *Id.* (quoting *In re Hughes*, No. 06–80219, 2006 WL 2620438, at *3 (Bankr. M.D. N.C. Sept. 11, 2006)). "Feasibility is 'fundamentally a fact question.'" *Keith's Tree Farms*, 535 B.R. at 652 (citing *Rape*, 104 B.R at 748).

## II.    Valuation

In order to get to feasibility, the Court must determine the value of the Terry farm, as the value bears heavily on the amount and manner in which the Debtor must pay Farm Credit and also the amount the Debtor must pay its unsecured creditors.  Without knowing the value of the real estate collateral, the amount the Debtor must pay to meet the 11 U.S.C. § 1225(a)(4) liquidation test cannot be determined.  Once those payment amounts are determined, the next step will be to determine if it is probable this debtor can actually pay them.

The Court viewed the Terry farm in April 2017.  The Court finds Mr. Waddle to be a capable and credible appraiser, thorough in his analysis and familiar with working farm properties in the Wythe and Smyth County, Virginia areas. Mr. Waddle confirmed the Court's belief that the farm is an exceptional property. The Court believes Mr. Waddle's value of $2,775,000.00 to be a valid starting point for appraisal, with several adjustments to follow.

First, Mr. Waddle appraised the farm as a dairy operation in January 2015, and updated his appraisal in March 2016, at which time it was still a dairy operation.  The income approach was evaluated both times.  While in the Reconciliation portion of his report, he gave greater weight to the sales comparison approach to arrive at the ultimate value of $2,775,000.00, one must question whether and to what extent the income approach could be used even as a back check now when the current source of income and associated expenses are speculative and cannot be projected into the future.  This is not a dairy farm anymore, and a market does not currently exist for the products derived from the new crop proposed to be sold.

Second, Mr. Waddle testified that since his last appraisal update in March 2016, there has been a general decline in the overall market in the area.   Finally, David Terry was firm in his belief that he could sell the farm for $3,500.00 an acre which equates to a value of approximately $2,362,500.00, which is well within the range of per acre prices in comparable sales contained in

Mr. Waddle's appraisal. Mr. Waddle's unadjusted comparable sales values were $5,652.03 per

acre (Comp 1), $3,906.25 per acre (Comp 2), $5,000.00 per acre (Comp 3), $2,552.15 per acre

(Comp 4), and $3,598.69 per acre (Comp 5). Mr. Waddle's report, after adjustments, reflected a

price per acre in March 2016 ranging from $3,062.58 per acre to $4,804.00 per acre, with an

overall mean of $4,019.05. Mr. Waddle concluded that comparable sales 2, 3 and 5, which had

adjusted price per acre, including improvements, ranging from $3,931.57 to $4,296.85, provided

the best indications of market value. Mr. Waddle concluded that in March 2016, the Terry farm

supported a valuation of $4,100.00 an acre rounded to a value of $2,775,000.00 based on

comparable sales. Given Mr. Waddle's testimony that there has been a general decline in the

market since that time, and that David Terry walked back his testimony on value after initially

suggesting the value did not include improvements, the Court believes that a value of

$2,500,000.00, or approximately $3,700.00 an acre, fairly represents the current value of the real

property and improvements on the Terry farm. This value also takes into account the recent

improvements that Branch Botanicals has made to the farm, such as lining the irrigation ponds.

### III.  Interest Rate and Feasibility

Section 1225(a)(5) of the Bankruptcy Code specifies the required treatment of secured

creditors provided for in a Chapter 12 Plan.[17] *In re Woods*, 465 B.R. 196, 204 (B.A.P. 10th Cir.

2012), succinctly lays out the groundwork for the interest rate analysis. *Woods* states as follows:

> Section 1225(a)(5) sets out the requirements for confirming a debtor's proposed
> treatment of an allowed secured claim. When the creditor objects to that

---

[17] Section 1225(a)(5) provides as follows: "(a) Except as provided in subsection (b), the court shall confirm a plan if . . . (5) with respect to each allowed secured claim provided for by the plan— (A) the holder of such claim has accepted the plan; (B)(i)the plan provides that the holder of such claim retain the lien securing such claim; and (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or (C) the debtor surrenders the property securing such claim to such holder." 11 U.S.C. § 1225(a)(5).

> treatment, the debtor must show that the creditor will retain its lien in the security
> and receive property, usually in payments, with a value that is equal to the amount
> of the creditor's allowed secured claim on the effective date of the plan.  This
> requires the bankruptcy court to determine the amount of the creditor's allowed
> secured claim and whether the proposed payment stream has a present value that
> is equal to the allowed secured claim.

*Id.*  In 2004, the United States Supreme Court entered the interest rate fray in the Chapter 13

context and decided *Till v. SCS Credit Corp*.  In *Till*, the Supreme Court rejected the use of

"coerced loan, presumptive contract rate, and cost of funds approaches."  *Till*, 541 U.S. at 477.

Concluding that each of these approaches "is complicated, imposes significant evidentiary costs,

and aims to make each individual creditor whole rather that to ensure the debtor's payments have

the required present value," the Supreme Court preferred beginning with the national prime rate

that is widely reported and enhancing it with a risk factor.  *Woods*, 465 B.R. at 206 (citing *Till*,

541 U.S. at 477).  Writing for a split majority, Justice Stevens observed that the prime rate

reflects the financial market's estimate of what a commercial bank should charge a creditworthy

borrower to compensate for opportunity costs, inflation risk, and a slight risk of default.  Debtors

posing a higher risk of default should pay a higher rate, adjusted for the "the circumstances of the

estate, the nature of the security, and the duration and feasibility of the reorganization plan."

*Woods*, 465 B.R. at 206 (citing *Till*, 541 U.S. at 479).  Four justices, joined by a concurring fifth

justice, observed that the "formula approach entails a straightforward, familiar and objective

inquiry" that "depends only on the state of the financial markets, the circumstances of the

bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its

interaction with the debtor."  *Id*.  As did the court in *Woods*, this Court considers the record and

the ruling on this issue in *Till's* light.

The Court takes judicial notice that the prime rate as of confirmation was 4.25%.[18]  The

Debtor proposed a 1.75% upward adjustment from a prime rate of 4.0%, or a rate of 5.75% to

amortize Farm Credit's secured debt and meet the requirements of Section 1225(a)(5) under *Till*.

The Debtor's Amended Plan further proposed a fifteen (15) year amortization and a nine (9) year

balloon, which would be roughly co-extensive with the expiration of the Branch Botanicals

contract.   The Debtor proposes a monthly payment to Farm Credit of $16,039.59, based on a

secured claim of $1,995,227.27.  The secured claim is calculated off Farm Credit's secured proof

claim of $2,100,437.27, minus $105,160.00 in adequate protection payments previously made

and all applied to principal.  *See* Amended Plan, at p. 2 (Docket No. 169).

The 1.75% upward adjustment was based on the testimony of the Debtor's expert witness

on interest rates, Jay Kilkenny of Kinsale Advisors.   Mr. Kilkenny has extensive experience in

commercial lending, problem loan restructures, and interest rates, but limited experience in

agriculture lending.  He did substantial due diligence in attempting to come up with an

appropriate risk adjustment based on his understanding of the *Till* analytics, including reviewing

Farm Credit's lending portfolio and rates charged other agricultural customers.  He evaluated the

secured lender's position from a loan-to-value ("LTV") ratio, basing his current estimate of Farm

Credit's collateral at $2,400,000.00, resulting in an approximate 85% LTV ratio.   He also met

with the Terrys and visited the farm in person.  The highest risk factor that Mr. Kilkenny found

was the fact that the Debtor had "all its eggs in one basket" with Branch Botanicals, an unproven

start-up with hard to project revenues or sustainability.  To Mr. Kilkenny, this risk merited a

1.25% increase over prime.  Mr. Kilkenny also added a .25% increase based on a high LTV ratio,

---

[18] The prime rate adjusted to 4.25% from 4.0% on June 15, 2017.  *See*
http://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.

which was beyond what most agriculture lenders would desire at a high of 75% LTV, and .25% increase given the Debtor's past credit history. Thus, the total adjustment upward was 1.75%.

On cross-examination, Farm Credit challenged the risk adjustment based on Branch Botanicals, pointing out that Branch Botanicals is funding growth of a crop with uncertain potential. Further, it has currently no product to sell, no processing plant under construction—much less operating—and no contracts for purchases of its end product. It also does not have a required wastewater permit from the DEQ that will be necessary for the plant to operate once constructed. Farm Credit also challenged the risk based on Branch Botanicals's "burn rate" of capital, and the fact it needs to raise additional funds in the next two to three months, given that it does not currently have additional cash on hand or binding commitments to receive additional funding.

Farm Credit, in turn, called A.P. "Chip" Saufley, II, the chief lending officer of Farm Credit, to testify as to what he thought would be an appropriate risk adjustment for this loan applying the *Till* factors. It rapidly became clear that Mr. Saufley's analysis was based more on Farm Credit's loan underwriting standards, and what it would take Farm Credit to make this loan as a new loan, not what an appropriate interest rate would be for a loan that was already made to an existing borrower with existing collateral in compliance with Section 1225(a)(5) of the Bankruptcy Code. On the Farm Credit loan rating scale, with 1 being pristine and 14 being a loss, Mr. Saufley advised the Debtor's loan was risk graded 12, and that an appropriate upward adjustment over prime would be a 16% increase. The Court found Mr. Saufley's testimony to be unhelpful at best and lacking in credibility. Mr. Saufley did little more than demonstrate to the Court that Farm Credit wants out of this particular credit and that his testimony was designed to meet that end.

Farm Credit has the burden of substantiating the increase over prime under the *Till* analytics.[19]  Even though its own witness was less than convincing, the cross-examination of Mr. Kilkenny and the evidence as a whole persuades the Court that the interest rate is too low, and the balloon payment too long, to compensate Farm Credit for the risk of funding what is essentially a start-up venture.  The Court believes a 2.5 % risk adjustment over prime is appropriate in the circumstances of this case, to adjust as prime adjusts, and that a 7-year balloon would be more appropriate.  Farm Credit financed a dairy farm operation.  It knows dairy farms and what to look for when a dairy farm may be in trouble.  This is a different venture altogether. It is not as if the Debtor started raising pumpkins or soybeans, for which there are known markets.  There is no known market for the product derived from the cherry plants at issue here, and no reliable way to project a revenue stream into the future.

On the other hand, the Debtor owns substantial valuable real estate and notwithstanding Farm Credit's protests, the Court does not believe the real estate collateral is being impaired by the current operation.  Farm Credit's references to the cherry plants being similar to kudzu is unpersuasive.  Had Farm Credit brought in an expert to testify that significant waste was being committed to its collateral, the Court might have a different opinion, but Farm Credit did not.  If anything, Branch Botanicals has added value to the collateral and in terms of improvements and cash outlays to the Debtor, it has expended approximately $1,100,000.00 in funds since the inception of its contract.  Branch Botanicals has, so far, put forth substantial financial resources

---

[19] "[T]he formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate."  *Till*, 541 U.S. at 484–85; *see also In re Prescott*, Case No. 11-10789, 2011 WL 7268057 (Bankr. S.D. Ga. 2011).

to get the operation up and running, and no small sum has inured to Farm Credit's benefit.[20]  The

Court is not prepared to discount or diminish those efforts at this stage of the case.

This leads to the shortened balloon period.  The Debtor has proposed a nine-year balloon,

but the Court believes that to be too long.  Within seven years, and possibly much sooner than

that, it will be known whether the venture with Branch Botanicals will either succeed or not.

Branch Botanicals needs additional capital, a processing plant, and time to locate customers for

its end product.  Whether that product will sell and be a commercially viable operation remains

to be seen.  If it does succeed, then the Debtor will have a track history, a performing business

model, and collateral that it can take to the financial markets for new financing.   If it does not

succeed, then Farm Credit can take such action as its loan documents permit if the Debtor cannot

find replacement financing or capital elsewhere.  Under the Court's calculations, a $2,100,437.27

secured claim, paid at 6.75% on a 15-year amortization would lead to a monthly payment of

$18,587.00.[21]  The Court believes this to comport with the instructive language in *Till,* in terms

of setting the interest rate that, "[t]ogether with the cramdown provision, this requirement

obligates the court to select a rate high enough to compensate the creditor for its risk but not so

high as to doom the plan.  If the court determines that the likelihood of default is so high as to

necessitate an 'eye-popping' interest rate (citation omitted), the plan probably should not be

confirmed."  *Till,* 541 U.S. at 480–81.

---

[20] The lining of the irrigation ponds is a significant improvement, and to date, Farm Credit has received over
$105,160.00 on adequate protection payments.

[21] This calculation is a starting point based on Farm Credit's secured claim as filed. The portion of Farm Credit's
claim intended to be secured is over-secured. The Court does not believe all post-petition payments to Farm Credit
should be credited solely to principal.  Some portion should be allocated to post-petition interest, because had Farm
Credit's collateral been liquidated, the entire secured claim likely would be paid in full.   As the payments are
reallocated, this secured portion of the claim should change. *See* 11 U.S.C. § 506(b) ("To the extent that an allowed
secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be
allowed to the holder of such claim, interest on such claim . . . .").

IV.   **Third-Party Injunction**

There are two separate state court civil actions pending against the Terrys individually,

the action filed by Farm Credit and the action filed Southern States.  All of the Terrys as

individuals are defendants in those actions, except Jacob Terry.  He is not a defendant in the

Southern States action, at least at this point.  Terry Dairy is also a defendant in the Southern

States action.  The Debtor's Amended Chapter 12 plan provides in capitalized, bold print, and

underlined, as follows:

> The confirmation order shall constitute and provide for a permanent injunction
> against all persons including but not limited to Southern States and Farm Credit of
> the Virginias, ACA from initiating, continuing or prosecuting any actions or
> claims, including but not limited to the claims set out in two lawsuits pending in
> the circuit court of Smyth county, the first being the case of Southern States v.
> Levi Terry, Jason Terry, Terry Dairy, LLC, David Terry and Jacob Terry; the
> second being the lawsuit filed by Farm Credit of the Virginias, ACA against
> Jacob Terry, David Terry, Jason Terry and Levi Terry defendants, and their
> respective agents, affiliates, advisors, retained professionals, representatives,
> shareholders, officers and directors arising out of any out of or in any way
> relating to either lawsuit.

Amended Plan, at p. 5 (Docket No. 169).[22]

Farm Credit's actions are against the non-debtor defendants as co-borrowers under the

Restructure Agreement.  Southern States is pursuing a cause of action against the defendants as

successors in interest to the Trust.  It sold goods to the Trust, but the Trust conveyed all of its

assets to Terry Dairy or to the Debtor and defaulted on its obligations to Southern States.  *See*

Southern States Ex. B.

The evidence at trial reflects Levi, David and Jason Terry have little in the way of assets,

but Jacob Terry owns his home free and clear of liens through a limited liability company called

---

[22] The manner of disclosure of the third-party injunction language tracks Bankruptcy Rule 3016(c), which applies to
Chapter 9 and Chapter 11 cases.  There is no counterpart to Bankruptcy Rule 3016(c) for Chapter 12 or Chapter 13
cases.

J.J. Terry, LLC.  Terry Dairy, in turn, owns equipment used at the farm, some of which—by the

Terrys' admissions at trial—is unnecessary in furtherance of the cheery tree operation with

Branch Botanicals.  Because that personal property is not owned by the Debtor, the Amended

Plan makes no provision as to whether it will or will not be liquidated.  The Terry Dairy

equipment appears to stand as additional collateral, not owned by the Debtor, for the Farm Credit

debt.  *See* Farm Credit Ex. 65.

   Section 1201 of the Bankruptcy Code provides for the stay of actions against co-debtors

for consumer debts.  11 U.S.C. § 1201(a).  The debts owed to Farm Credit and Southern States

are not consumer debts, and Section 1201 does not apply.  Debts incurred by a family farmer are

business debts rather than consumer debts if they are incurred to finance the farming business.

Further, a debtor corporation cannot incur a consumer debt.  *See In re SFW, Inc.*, 83 B.R. 27

(Bankr. S.D. Cal. 1988).  As stated in *Credit Alliance Corp. v. Williams*, 851 F.2d 119, 121 (4th

Cir. 1988), "Congress knew how to extend the automatic stay to non-bankrupt parties when it

intended to do so."  Since the automatic stay does not apply, the Debtor must find support

elsewhere.

   This leads to 11 U.S.C. § 105(a), which the Debtor relies upon for injunctive relief.  *See*

Debtor's Memorandum in Support of Confirmation, at pp. 10–11 (Docket No. 188).  Section

105(a) empowers the Bankruptcy Court to issue "any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C.

§ 105(a).  Case law holds that Section 105(a) enables the bankruptcy court to enjoin certain

actions against third party non-debtors which are not covered by the automatic stay of Section

362.  *See, e.g.*, *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002 (4th Cir. 1986), *cert denied,* 479

U.S. 876 (1986).  This provision "empowers the bankruptcy court to enjoin parties other than the

bankrupt from commencing or continuing litigation."  *Kreisler v. Goldberg*, 478 F.3d 209, 215

(4th Cir. 2007) (citing *Piccinin*, 788 F.2d at 1002).

Normally, an injunction to stop a pending lawsuit against third party co-borrowers or

guarantors is filed by adversary proceeding seeking a preliminary injunction under Bankruptcy

Rule 7065.  *See In re Looney*, 823 F.2d 788, 792 (4th Cir. 1987).  As the Fourth Circuit stated in

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013):

> The Supreme Court established the standard for imposing a preliminary injunction
> in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365,
> 172 L.Ed.2d 249 (2008). That case requires parties seeking preliminary
> injunctions to demonstrate that (1) they are likely to succeed on the merits, (2)
> they are likely to suffer irreparable harm, (3) the balance of hardships tips in their
> favor, and (4) the injunction is in the public interest. *Id.* at 20, 129 S.Ct. 365.
> Before the Supreme Court issued its ruling in *Winter,* this Court used a "balance-
> of-hardship test" that allowed it to disregard some of the preliminary injunction
> factors if it found that the facts satisfied other factors. *Blackwelder Furniture Co.
> of Statesville, Inc. v. Seilig Mfg. Co.,* 550 F.2d 189, 196 (4th Cir. 1977). However,
> in light of *Winter,* this Court recalibrated that test, requiring that each preliminary
> injunction factor be "satisfied as articulated." *The Real Truth About Obama, Inc.
> v. FEC,* 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds, Citizens
> United v. FEC,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), *aff'd, The
> Real Truth About Obama, Inc. v. FEC,* 607 F.3d 355 (4th Cir. 2010) (per curiam).
> Accordingly, courts considering whether to impose preliminary injunctions must
> separately consider each *Winter* factor.

*Id.* at 320–21; *see also Morley-Mower v. Professional Foreclosure Corporation of Virginia*,

Civil Action No. 5:16-mc-1, 2016 WL 3811553, at *3 (W.D. Va.  June 21, 2016).

A party seeking to enjoin a creditor's action against a non-debtor third party must show,

among other things, that irreparable harm to the debtor's estate or to the debtor's ability to

reorganize will result if the injunction is not granted.  *See, e.g.*, *id.*; *In re Continental Air Lines,

Inc.*, 61 B.R. 758, 781 (S.D. Tex. 1986); *Matter of Uiterwyk Corp.*, 36 B.R. 533, 534 (Bankr.

M.D. Fla. 1983). "[I]njunctive relief in favor of non-debtors must be considered an extraordinary

remedy to be granted only when a significant and direct impact on the reorganization

proceedings is threatened." *In re Continental Air Lines*, 61 B.R. at 781.

Recent case law has emerged in the Fourth Circuit addressing third party releases in Chapter 11 plans.  *See Behrmann v. National Heritage Foundation, Inc*., 663 F.3d 704 (4th Cir. 2011) ("*NHF I*"), and *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344 (4th Cir. 2014) ("*NHF II*").[23]  However, this case deals with a Chapter 12 Plan and we are not dealing with a release request *per se* at this time.  However, the plan does request a "permanent injunction" against all persons, including but not limited to Farm Credit and Southern States, which could be tantamount to a release if given effect as drafted. Whether characterized as an injunction or a release, the third-party release provision in the Debtor's Chapter 12 plan fails because the evidence is insufficient under either standard.

In *In re River Family Farms, Inc.*, 85 B.R. 816 (Bankr. N.D. Iowa 1987), a Chapter 12 case, the bankruptcy court addressed an injunction to prevent a creditor from enforcing its rights against the non-debtor stockholders of the Debtor farm corporation.  In that case, the stay had been modified to allow the bank to continue foreclosure proceedings against two parcels of land owned by the stockholders that had been pledged as security for a corporate loan.  After the foreclosure sale left a deficiency, the bank then sought to execute the judgment against the non-debtors' stock of the Debtor.  The non-debtors stated that, if the stock were sold to the bank, they

---

[23] In *NHF II*, the Fourth Circuit referred back to *NHF I* and observed as follows:

> Although we reiterated this circuit's longstanding rule that non-debtor releases may be enforced in appropriate circumstances, we cautioned that they should only be approved "cautiously and infrequently." *Id.* at 712. To determine whether such circumstances exist, we directed the bankruptcy court to consider the six substantive factors enumerated in *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648 (6th Cir. 2002). These include whether: (1) There is an identity of interests between the debtor and the third party . . . ; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization . . . ; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; [and] (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full.

*NHF II*, 760 F.3d at 347.

would not likely continue to work for the Debtor, which would compromise the Debtor's

reorganization efforts. *Id.* at 817–18.

*River Family Farms* proceeded to analyze the essential injunction factors. As to whether

the stockholders would be irreparably harmed absent the injunction, the court looked to whether

the stockholders had an adequate remedy at law. The Court concluded that the stockholders did

have such a remedy—they could file their own bankruptcy petitions. In addition, absent the

stockholders filing their own petitions, the stockholders would in essence receive the benefit of

the automatic stay while the creditor would not receive the benefits to which it would be entitled

if they were to file their own petitions. The court found it relevant that the stockholders had not

pledged personal assets to fund the corporation.

As to the probability of success on the merits, the *River Family Farms* court stated that

the factor "has been interpreted in the bankruptcy context to mean that the guarantor must show

that the debtor's plan, when confirmed, would provide for 100% payment of the underlying

debt." *Id.* at 820. The plan in that case did not provide for payment of the debt which the bank

was seeking to collect from the stockholders.

As to the final two factors, the court summarily stated that the balance of the harm

weighed in favor of the debtor because its reorganization efforts would be hindered, and the

court did not address the public interest factor. Rather, since the debtor failed the first two

factors (irreparable harm and the probability of success on the merits), the Court offered no

opinion as to public interest and ruled against the granting of a permanent injunction.

This case is not unlike *River Family Farms*. Relevant to both the injunction standards

and the release factors, there is no demonstrable contribution to the Chapter 12 case in terms of

personal assets other than the Terry family members' individual promises to contribute their hard

work to make the operation a success.  Moreover, also relevant to both the injunction and release

tests is whether the unsecured creditors, including those sought to be enjoined, are going to be

paid in full.  That is far from certain in this case, especially since the liquidation test of 11 U.S.C.

§ 1225(a)(4) will have to be recalculated based on the Court's valuation of the real property.

Also, to the extent that the members of the Terry family have other creditors that are not also

creditors of the Debtor, those creditors would not be foreclosed from going after the assets of the

Terry family members, even as limited as they are.  Thus, the balance of the equities tips in favor

of the parties sought to be enjoined.  In terms of public policy, while bankruptcy policies

generally favor reorganization, public policy also favors the enforcement of contracts, and

certainly as to Farm Credit, it negotiated for and obtained third-party obligors other than the

Debtor.  The Court finds this last factor to be neutral.  In sum, for all of the above reasons, the

Court will not approve the third-party injunction language in the plan.


## CONCLUSION

The Court denies confirmation of the Debtor's Amended Chapter 12 Plan filed June 1,

2017.  However, the Debtor will be given leave to file a Second Amended Plan within 21 days

of the entry of the Court's contemporaneous Order which takes into account the terms of the

Court's rulings herein.  For purposes of the confirmation of the Second Amended Plan, the value

of the real property and improvements is $2,500,000.00.  The interest rate to be paid to Farm

Credit shall be a variable rate equal to the generally accepted prime rate plus 2.5% per annum,

and the plan should provide a 15-year amortization with a seven (7) year balloon.  The Court will

not relitigate those issues, nor will the Court relitigate the issue of the alleged invasive nature of

the cherry tree plants.  The Court will, however, re-evaluate feasibility based on payment terms

that conform to those set forth above.  This case presents an interesting conundrum as to feasibility.  Should the Court telescope the Debtor's feasibility to Branch Botanicals's feasibility?  At this point, Branch Botanicals has performed under its contract, and that money has flowed through to the Debtor.  Important to the Court's decision will be whether Branch Botanicals has raised any additional funds and made any additional progress towards construction of its processing facility.  The Court will also consider whether Branch Botanicals can demonstrate its financial wherewithal to proceed beyond the immediately foreseeable future, for as goes Branch Botanicals, so goes this Debtor.

A separate Order will be entered contemporaneously herewith.

Decided this 6th day of July, 2017.

_____
UNITED STATES BANKRUPTCY JUDGE